Filed 4/29/14  In re Timothy M. CA43

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re TIMOTHY M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.M. et al.,<br><br>    Defendants and Appellants. | G049086<br><br>(Super. Ct. No. DP022438)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary G. Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant E.M.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　\*　　　\*

M.M. (mother) and E.M. (father) appeal from the juvenile court's judgment terminating their parental rights to Timothy M. (born August 2009).[1]  The parents contend the juvenile court abused its discretion by denying mother's Welfare and Institutions Code section 388 (all further statutory references are to this code unless noted) petition without an evidentiary hearing, and erred in finding inapplicable the continuing benefit exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).  Finding no basis to overturn the orders, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In November 2009, Los Angeles County social workers took into protective custody two-month-old Timothy and his nine-year-old half-sibling R.C.  The Los Angeles juvenile court later sustained a petition alleging that in July 2008 mother physically abused R.C. (then eight years old) by grabbing and choking him.  R.C. stated the attack occurred as the family drove mother to the hospital for mental health issues.  Mother was subsequently placed under a 72-hour hold for a mental health evaluation. (§ 5150.)  In November 2009, an unnamed party reported the parents were unable to care for the children because of mental illness (schizophrenia) and substance abuse issues.

---

[1]  Father's participation and cooperation with the case plan was minimal, and he failed to attend the section 366.26 hearing.  He repeatedly tested positive for marijuana during the reunification period and inconsistently visited with Timothy.  He voiced his desire that mother have custody of Timothy.  On appeal, father joins in mother's arguments and asserts we must reverse the judgment terminating his parental rights if we reverse mother's judgment.  (Cal. Rules of Court, rule 8.200(a)(5); rule 5.725(a)(2) [court may not terminate the rights of only one parent absent exceptions not applicable here].)

2

Mother had informed the reporting person that Timothy was born with a medical condition and could not swallow food through his mouth because his throat was too short. Social workers learned the parents had a history of domestic violence involving father's physical abuse of mother. Mother was dependent on alcohol, marijuana and cocaine, used illicit drugs while pregnant with Timothy, and had a history of arrests and convictions for drug and theft-related crime. Father also abused marijuana and alcohol. During a monitored visit with Timothy in December 2009, mother overreacted to a self-inflicted fingernail scratch on Timothy's face by demanding the social workers intervene to protect her child from his caretakers. Ultimately, the parents reunified with Timothy in June 2011. The court placed R.C. with his father in Orange County and mother had weekly visits.

In April 2012, Orange County social workers detained Timothy after police officers arrested mother following a domestic dispute with the maternal uncle During the incident, mother cut her brother's arm with a steak knife. Mother told officers the uncle, who she claimed had a history of drug use and illegal activities, insulted Timothy because he was part African-American. Mother claimed the uncle also accused her of "snitch[ing]" on him in a counterfeiting case, and had pushed Timothy against a wall during the argument. According to mother, he "walked into" the knife and cut his forearm when he attempted to assault her. The uncle, however, informed officers mother was upset because she thought someone had stolen her "government-issued cheese" and she chased him as he tried to lock himself in the bathroom. He denied attacking mother or that she stabbed him in self-defense. The physical evidence did not support mother's version of the incident. At the time of the assault, mother also had an outstanding warrant for hit and run driving, and driving without a license.

The Orange County Social Services Agency (SSA) filed a petition (§ 300, subds. (b), (g) & (j)) alleging Timothy was at risk of harm based on mother's assault and

incarceration, mother's history of mental health issues, her abuse of marijuana, and Timothy's prior dependency.

Mother pleaded guilty to aggravated assault and the criminal court placed her on probation. In May 2012, the parents pleaded no contest to the amended allegations of the dependency petition and the court declared Timothy a dependent of the court. The court removed Timothy from parental custody and ordered reunification services for the parents.

Mother's case plan required her to submit drug tests for 90 days, to attend anger management counseling, individual counseling, and parenting education. The case plan required a substance abuse treatment program if she submitted a positive drug test. The court authorized twice-weekly supervised visitation after mother obtained her release from jail May 27, 2012. The social worker later liberalized visits to allow unmonitored meetings.

In August 2012, SSA filed a section 388 petition to restrict mother's unsupervised visits after mother produced three diluted drug tests in June and July. The drug testing company considered a diluted test the equivalent of a positive test. The social worker informed mother she would have to participate in outpatient drug treatment if she continued to submit diluted tests. Mother complained she was drinking lots of water because she was on a diet and was "'traumatized'" by the social worker's advice not to drink so much before testing and to test early in the morning. In early August 2012, mother's therapist, Lorraine Tuala, reported mother fainted during a session after saying her "heart was hurting." Responding paramedics concluded mother's fainting spell was not caused by a medical condition. Mother claimed the hospital advised her that her urine was "'concentrated'" and her "'blood was dehydrated.'" Following a hearing on the petition, mother agreed to wear a drug patch and a "SCRAM" (transdermal alcohol testing) bracelet in lieu of restricting her visits with Timothy. The court denied the section 388 petition without prejudice.

4

In September 2012, mother complained Timothy was learning profanity and aggressive behaviors in his foster placement. She also felt the foster mother neglected Timothy's hygiene, and accused the foster mother and foster family agency (FFA) social worker of "lying and 'covering up' for their mistreatment" of Timothy. The FFA social worker visited the foster home and did not observe Timothy "cuss, spit or hit the monitor or other people" or use profanity or act aggressively. Nonetheless, after a team decision meeting, the parties agreed to move Timothy to a different foster home. SSA placed Timothy with new foster parents on September 27. The prior caretaker's teenage son later admitted teaching Timothy profanities because he "thought it was funny." Mother stated, "'[t]his is child abuse! They mentally and physically abused my child and they should be arrested.'"

The social worker's report for the November 2012 six-month status review noted Timothy had two bouts of breathing difficulties requiring medical treatment, and he appeared to have delayed speech issues. The social worker described mother's cooperation with the case plan as "moderate." She tested negative for drugs, other than the diluted tests, and tested negative after wearing the drug patch and bracelet. The social worker referred mother to the county's perinatal substance abuse program in August, but mother claimed the program would not accept her because she was not a drug user.

Mother completed a four-week parenting education class in June 2012. She completed individual counseling with Tuala in October 2012. The counselor reported mother was punctual and "an active participant and showed progress towards her goals." Mother, however, rejected Tuala's efforts to refer her to other resources. Mother completed her anger management program in October 2012. The anger management counselor, Kathy Pauley, reported mother often identified herself as a victim, made "'off topic'" remarks, and could not articulate what she had learned. Pauley did not believe mother would benefit from more anger management classes because mother's "'problems are greater than that. I think she would benefit more with individual counseling and with

5

someone with a psych background.'"  The social worker advised mother of Pauley's concerns and recommended additional individual counseling, but mother replied she did not need more counseling, citing Tuala's earlier report.

SSA increased mother's unmonitored visitation to six hours (three hours twice a week) beginning November 14, 2012.  Mother brought food and toys for the visits and entertained Timothy by playing and reading to him.  Timothy cried at the end of mother's visit in June 2012, and stated "'there's mommy'" when he saw her at the beginning of another visit in October 2012.  He did not get up or call out to her, however, and sat near the foster parents rather than mother.  Mother was pleased with the "'beautiful'" new foster family, stating Timothy was "'lovable again, isn't saying no bad words, and isn't aggressive.'"

On November 27, the parties submitted on the social worker's reports and the court adopted the social worker's recommendation to continue reunification services.

In early January 2013, the social worker reported mother's visits had increased to eight unmonitored hours (two four-hour visits) weekly.  Timothy often was seen smiling and laughing in the foster home.  The foster parents reported that mother's behavior during daily telephone calls with Timothy seemed "'a bit strange. . . .  It seems she's got this routine and calls him and reads Bible verses to him and if he interrupts her, she doesn't answer his question and she keeps on reading.  Timothy . . . told her [one time], "No, you're not listening."  He was in a play at church and he was trying to tell her that, but she said, "no mijo" and kept on reading.  She doesn't seem to interact or engage him in the phone calls and maybe that's just her way of talking to him, but it's different.  We can tell you exactly what she will say each time on the phone and it's like a script.  It never changes and every day it's the same thing.'"  Because mother continued to provide negative drug tests, the court relieved mother from wearing the drug bracelet, but authorized funds for random drug testing at least eight times per month.

6

Mother continued to share an apartment with a roommate (she and father had long since separated) and worked in a food truck. Her probation officer reported mother was "'doing well'" and had reduced her level of supervision.

During this period Timothy participated in developmentally appropriate educational and extracurricular activities, but had difficulty pronouncing certain sounds. The school district offered Timothy speech therapy services, but mother declined to sign the requisite form. When asked why she did not sign the form, mother claimed she had not heard back from the school.

The foster parents reported Timothy did not want to visit mother. He cried, refused to get out of the car, and said "'mommy mean.'" He engaged in age-appropriate play with peers and the foster siblings, but also displayed aggressive behavior by taking away toys and food, throwing things, and hitting and pulling the foster sister's hair when he thought no one else was looking. In March, the foster mother found him kicking the family dog. He also hit the foster father in the stomach when he could not have ice cream.

During a February 2013 team meeting, mother complained about the current foster parents' ability to supervise and care for Timothy, and asserted Timothy had sustained "serious injur[ies]" in the foster home. The foster parents explained the child scraped his knee and bruised his eye during scooter and tripping accidents, and they had promptly reported and documented the incidents. The foster mother complained about mother's numerous false accusations and declared she could no longer work with her. The social worker noted mother had made similar, largely unjustified, complaints about Timothy's safety in both the current case and the Los Angeles case, and mother's "heightened sense of protection for her son . . . is unintentionally negatively impacting" his stable placement with the current caretakers. The social worker noted Timothy was happy in his current placement and had made progress, particularly regarding his speech

7

issues.  The social worker expressed concern that "another placement disruption . . . will have a detrimental" effect on Timothy's emotional well-being.

The social worker referred mother to additional parenting services and counseling, but mother declined to participate.  Mother continued to provide negative drug tests.  As of May 2013, the social worker had increased mother's unsupervised visits to 10 hours a week (five hours twice a week).  Timothy continued to resist visiting his mother.  During one visit, Timothy spoke to mother briefly and then "disengage[d] from her, showing flat affect and not speaking."  Mother sat silently eating her food.  On the way to a visit in late April 2013, Timothy became so upset the person transporting him had to pull the car over and console him.  He initially refused to get out of the car to see mother.  There was little interaction between the pair during visits.  Timothy and mother did not hug or kiss each other, and Timothy did not laugh or smile during these visits.  The foster parents reported Timothy became anxious and cried before the scheduled visits, and afterward was unusually quiet and would not talk about what he and mother did together.  He urinated in his pants after a few visits and one time came back without his shirt.  During another visit at a park, mother sat on a bench and did not play with Timothy for over an hour.  The foster parents noted Timothy's aggressive behavior surfaced after visiting his mother.  The FFA social worker noted Timothy responded well to 10-minute nightly phone calls with mother, but sometimes had to be coaxed to take the call.

In early May, the social worker advised mother she would like to see more interaction with Timothy.  Mother stated the way she "'bond[ed] with [her] son is I pray. I supervise him, I nurture him, caring for him, watching for his safety and always telling him that I love him and showing him good morals.'"  Asked how she played with Timothy, mother took out a children's Bible and said, "'I have his Bible, I have his toys and I'm always supervising him.'"  She noted Timothy had never suffered any "'vital injuries or any bruising'" in her care.  She said "'I know that I care for my child and

8

every mom bonds with their child differently and that is [] the response that I don't play with him enough.'" Asked what she had learned from the court process, mother stated "'[n]o comment,'" but then observed she was "'more aware of what people are capable of doing'" and explained Timothy was "'resistant [to her] during visit transitions" because he had been verbally abused in the prior foster home, and had suffered "'vital injuries from the current foster family.'"

The social worker observed Timothy had spent 75 percent of his life in foster care (33 of 45 months) over the course of two dependency cases, and mother had not "appear[ed] to have garnered any insight as to what has le[d] to her child's involvement, twice, with Social Services. While the mother is quick to respond to any perceived wrong-doings on the part of the child's caretakers and the Agency, [she] has failed to accept any responsibility for her actions leading to the Court's involvement." Mother had declined to sign the agreement to begin speech therapy and arrange time for an individualized education plan for Timothy. Mother's interactions with Timothy were minimal and her visits grew increasingly more difficult as Timothy's alienation increased. The social worker recommended terminating reunification services and setting a section 366.26 hearing because she "cannot assert that there is a substantial probability that the child will reunify with the mother now or in the next six months."

On May 23 the social workers informed the parents they had not made the necessary progress over the past 12 months to warrant continued reunification services. Mother objected, citing the programs and classes she had completed and her clean drug tests. She expressed love for Timothy, asserted "visits with Timothy [were] positive and interactive," and "was emphatic that she wants her son Timothy back into her custody." Mother contacted the social worker's supervisor and asked if she could have visits at locations that had cameras and the court could subpoena the employees to prove she did not "'abuse my child.'"

9

The school district evaluated and tested Timothy in early June. During the evaluation, the speech pathologist asked mother questions, but she would not respond to most questions. Mother was "'not engaged,'" and she and Timothy did not "'make eye contact.'" After the assessment, mother did not hug or kiss Timothy, but just patted him on the back. Mother thought "'[e]verything went well.'" She could not answer the speech pathologist's questions, explaining she did not care for Timothy on a daily basis and could not provide a detailed medical history. In August 2013, a speech pathologist advised Timothy did not require services.

During a June 6 visit, mother kissed Timothy at the end of the visit, whispered something to him, and he kissed her back. The foster agency social worker expressed concern "that there is not much interaction [by mother]" with Timothy during visits and "she does not comfort/consol[e] him or intervene, instead" she "stands back from the situation." The worker did not observe an emotional connection between the two and no physical or eye contact. Timothy continued to verbalize he did "not want to see 'mommy,'" although on May 31 he did get "out of the car easily and" go to mother.

At the 12-month permanency review on June 10, 2013, mother stipulated that returning Timothy to her custody would be detrimental, and agreed the court could terminate reunification services and schedule a section 366.26 hearing.

In August, the social worker reported Timothy's current foster parents advised they were not willing to adopt Timothy and believed he needed a more permanent home. Timothy's current respite caregivers, the M.'s, were "very much interested in adopting" Timothy. Timothy stayed and visited with the M.'s many times during the prior year and got along well with the M.'s and their two young boys. SSA placed Timothy with the M.'s on August 15, 2013.

During a visit on September 6, mother phoned 911 to report Timothy had blood in his urine, and he was screaming and yelling. Paramedics who responded to mother's emergency call released Timothy to the caregivers, who took him to the

emergency room. Timothy's treating physicians found no evidence of bleeding or bruising.

In September, the social worker reported Timothy was likely to be adopted and he would not suffer detriment if the court terminated parental rights. The social worker emphasized Timothy had spent most of his life in foster care, and while mother "attended to her Court ordered services . . . and her visits, and has expressed interest in reunifying with the child, [she] does not appear to have gained any insight" or accepted responsibility for her actions necessitating court intervention.

On September 30, 2013, mother filed a petition to modify the June 10, 2013 order terminating reunification services and setting the section 366.26 hearing. Mother argued she had "completed perinatal classes; never missed an unsupervised visit with the minor; made substantial progress in bonding with the minor child; taken the initiative to provide emergency medical assistance for the minor child on 9/6/13; On 9/12/13 minor is smiling and laughing and bonding well with mother; mom's tests are always clean; mom has completed all programs." Because mother and Timothy had "substantially bonded" since the June permanency review hearing, she requested a hearing to "determine whether it would be in minor's best interest to be reunified with mother."

Mother attached a card showing she attended Alcoholics Anonymous meetings between June and August 2013, and an August 20, 2013 letter verifying her attendance at five weekly sessions of a 12-week county-run parenting program "for parents who have responsibility for caring for at-risk children and youth." The parenting program began July 10, 2013, and was scheduled to run through September 25. Mother also provided a September 3, 2013 letter from the 12-month county-run perinatal outpatient drug and alcohol program reflecting mother enrolled June 12, 2013, she was in "Phase II – Assertion and Communication Skills," she drug tested every Monday and Thursday, and she had no positive or missed tests. She received scores of 5 out of 5 ("occurs very often") for attendance, acceptance of responsibility, help-seeking, active

11

engagement, self-disclosure, and sobriety.  She received a score of 4 ("often") for empathy and insight.  The program social worker stated mother was "active in all of her groups and in individual sessions" and "utilizes her time in therapy effectively by processing challenges that she experiences in her life.  [She] appears motivated and committed to create a safe environment for herself and hopes to be able to reunify with her son."  Mother also supplied a completion certificate for Phase I of the program dated July 29, 2013.

SSA and minor's counsel opposed mother's petition.  Minor's counsel urged the court to reject mother's modification petition because mother failed to address her mental health issues.  The court agreed that "drug abuse wasn't the only issue" and questioned whether mother had addressed her mental health and domestic violence issues.  The court explained it was concerned about mother's conduct on September 6th, noting "people that have no reason to prevaricate examined the child and found that there was no bleeding and there was no bruising.  Your client indicated there was both."  The court observed mother subjected Timothy to an unnecessary medical examination, concluding mother "was, in some fashion, delusional and observed something that was not there, or secondly, was engaged in some sort of conduct which did not represent the truth."  The court denied the section 388 petition without an evidentiary hearing, finding mother's request failed to present new evidence or a change of circumstances and the proposed change was not in Timothy's best interest.

At the section 366.26 hearing, mother submitted the matter on the social worker's reports and waived cross-examination of the social worker.  The court found Timothy likely to be adopted, found the parent-child benefit exception did not apply, and terminated parental rights.

II

DISCUSSION

A.   *The Juvenile Court Did Not Abuse Its Discretion in Denying Mother's Modification Petition Without a Hearing*

Mother contends the juvenile court abused its discretion in denying her section 388 petition without a hearing.  She notes after the June 10 order terminating reunification services she continued to test negative for drugs, she enrolled and was making progress in the perinatal substance abuse program, she completed another parenting class, and she had maintained 10 hours a week of unmonitored visitation and telephone calls with Timothy.  She also relies on earlier information, including her individual therapist's October 2012 completion letter describing mother's progress in reaching the goals set at the outset of therapy.  Mother argues the foregoing required the court to conduct a hearing on her modification petition.

Section 388 provides in relevant part, "(a)(1) Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . . [ ¶ ] . . . (d) If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . , the court shall order that a hearing be held . . . ."

A modification petition "must be liberally construed in favor of its sufficiency."  (Cal. Rules of Court, rule 5.570(a).)  But "the parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.'"  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  The "prima facie requirement is not met unless the facts alleged . . . would sustain a favorable decision on the petition."  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *In re Alexis W.* (1999) 71 Cal.App.4th 28, 36 [party seeking modification "has the burden of showing not only

13

that circumstances have changed, but that [proposed change] would be in the child's best interests"].) We review the juvenile court's summary denial of a section 388 petition for an abuse of discretion. (*In re Angel B.*, (2002) 97 Cal.App.4th 454, 460.) An abuse of discretion occurs when the trial court makes an """"arbitrary, capricious, or patently absurd determination.""" (*In re Arthur C.* (1985) 176 Cal.App.3d 442, 446.)

The court did not abuse its discretion in denying mother's petition because mother failed to present evidence showing a change of circumstances that required a hearing. Indeed, mother's petition failed to show she took any steps to address her mental health issues since the court terminated reunification services in June 2013. The court correctly determined mother's mental health was a crucial factor in deciding whether Timothy could be safely returned to his mother's care. Ample reasons supported the court's view. Mother's odd conduct surfaced repeatedly throughout the case and continued into September 2013. In November 2009, mother reported, without factual basis, Timothy was born with a medical condition and could not swallow food through his mouth because his throat was too short. During a monitored visit in December 2009, mother overreacted to a self-inflicted fingernail scratch on Timothy's face. In April 2012, mother used a steak knife to stab her brother in the arm because she thought someone had stolen her government-issued cheese.

Around August 2012, mother complained she was on a diet and drinking lots of water and was "'traumatized'" by the social worker's advice not to drink too much water before drug testing, and to test early in the morning. In August 2009, mother's therapist reported mother fainted during a session after saying her "heart was hurting," but paramedics concluded there was no medical basis for her claim. Mother claimed the hospital advised her urine was "concentrated" and her "'blood was dehydrated.'"

In September 2012, mother complained the foster mother and FFA social worker were "lying and 'covering up' for their mistreatment" of Timothy. Mother overreacted to information the foster brother had exposed Timothy to profane language

14

by demanding authorities arrest the foster parents for mentally and physically abusing her child.

Mother's anger management counselor, Kathy Pauley, reported in November 2012 that mother often identified herself as a victim, made "off topic" remarks and could not articulate what she had learned. Asked if mother could benefit from more anger management classes, Pauley responded mother's "'problems are greater than that. I think she would benefit more with individual counseling and with someone with a psych background.'" Mother, however, rejected the notion she needed more counseling.

In January 2013, the foster parents reported mother's behavior during daily telephone calls with Timothy seemed "'a bit strange. . . . It seems she's got this routine and calls him and reads Bible verses to him and if he interrupts her, she doesn't answer his question and she keeps on reading. . . . We can tell you exactly what she will say each time on the phone and it's like a script. It never changes and every day it's the same thing.'"

During a February 2013 team meeting, mother complained Timothy had sustained "serious injur[ies]" in the foster home. In fact, he had scraped his knee and bruised his eye during scooter and tripping accidents. The foster mother, who reported and documented the incidents, complained about mother's escalating and false accusations and stated she could not longer work with her. In May 2013, mother noted Timothy had never suffered any "'vital injuries or any bruising'" in her care and asserted he had been verbally abused in the prior foster home, and had suffered "'vital injuries from [the] current foster family.'" At a May 23 team meeting mother stated she wanted to visit Timothy at locations that had cameras so the court could subpoena the employees to prove she did not "abuse my child."

Finally, on September 6, 2013, mother phoned 911 to report Timothy had blood in his urine. An emergency room physician found no injuries and nothing else corroborated mother's claim.

15

The issue in September 2013 was not whether, as mother suggests, she continued to abuse controlled substances. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 766.) The question was whether Timothy would achieve a stable placement if returned to her care. Her unjustified complaints about Timothy's safety negatively impacted his well-being and suggested she was incapable of providing a stable and secure environment. The history of the case reflects that as of September 2013, mother had not surmounted the issues that had caused now four-year-old Timothy to enter and remain in foster care for over 75 percent of his life. Mother's decision not to participate in additional counseling or other services recommended by the social worker showed mother failed to appreciate how important her mental health was to Timothy's well-being. Mother's participation in substance abuse treatment, additional parenting, and other programs after the court terminated reunification services in June 2013 was laudable, but as the September 6 incident demonstrated, the root problem remained.

The evidence of mother's interaction with Timothy during their visits showed it was not in Timothy's best interests to return to his mother's care. Although SSA consistently increased the duration of Timothy's visits with mother during the reunification period, Timothy often verbally and physically resisted these encounters. The foster parents reported Timothy became anxious and cried before visits, urinated in his pants, and afterward increased his aggressive behaviors. The FFA worker expressed concern mother did not physically and emotionally interact with Timothy, who reciprocated her lack of involvement. The social worker advised mother to try different techniques to engage Timothy during visits, but mother declined, stating the way she "'bond[ed] with my son is I pray. I supervise him, I nurture him, caring for him, watching for his safety and always telling him that I love him and showing him good morals.'" Timothy's reactions and interactions with mother during visits supported the juvenile court's finding Timothy's best interests would not be promoted by mother's

16

proposal to vacate the order terminating services and return Timothy to her care in September 2013.

Mother notes SSA's report for the section 366.26 hearing does not reference her numerous visits (21 visits, 160 hours) occurring after the court terminated mother's reunification services in June 2013, other than those occurring on September 6 and 12. Mother suggests the juvenile court could not have made an informed decision whether to set mother's modification petition for a hearing, but the court had before it mother's statements in her petition that she had "made substantial progress in bonding with the minor child" and that on September 12 Timothy "is smiling and laughing and bonding well with mother" and "[e]ach weekly unmonitored visit with Mother and the minor child has been successively progressive in that they are bonding well, laughing and enjoying each other's company – something that was not as evident prior to the court's order in June." The court could assess these generalized statements against the descriptions of prior visits.

Mother states she "is a committed and loving mother who has gone above and beyond to reunify with her son and done all that was asked of her. Is she perfect? Certainly not, but neither are most parents, and '[w]e do not get ideal parents in the dependency system.' (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.)" The question for the juvenile court was not mother's love and commitment, which no one questions, but whether circumstances had changed to such an extent that Timothy's best interests would be served by modifying the June 2013 orders. The court reasonably could find based on mother's petition, considered in context with the history of the case, that mother failed to make a prima facie showing requiring a hearing.

B.    *The Juvenile Court Did Not Err In Failing to Apply the Parent-Child Benefit Exception to the Termination of Mother's Parental Rights*

Mother argues the juvenile court erred by failing to apply the parental benefit exception (§ 366.26, subd. (c)(1)(B)(i)) to avoid terminating her parental rights. The court did not err.

Section 366.26 provides that after reunification efforts have failed and the court finds the child is likely to be adopted, "the court shall terminate parental rights" (§ 366.26, subd. (c)(1)), unless specified circumstances exist. One exception is where "[t]he court finds a compelling reason for determining that termination would be detrimental" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

To apply the statutory exception, the child must "benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The benefit exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 (*Jasmine D.*).) To the contrary, once the mandated period for reunification has passed, the parent bears the burden of proving that termination of parental rights will be detrimental to the child. (*Id.* at p. 1350.) After reunification efforts end, the Legislature's preferred permanent plan calls for termination of parental rights and subsequent adoption. (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799; *In re Cody W.* (1994) 31 Cal.App.4th 221, 227-231.) "Adoption is the Legislature's first choice because it gives the child the best chance at . . . commitment from a responsible caretaker. [Citations.]" (*Jasmine D.,* at p. 1348.) Thus, the benefit prong of section 366.26, subdivision (c)(1)(B)(i), is satisfied only if "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a

18

permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) The court's balancing of competing considerations must be performed on a case-by-case basis, taking into account variables such as the child's age, "'the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. [Citation.]'" (*Jasmine D.,* at pp. 1349-1350; *Autumn H.,* at pp. 575-576.)

The party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions bears the burden to produce that evidence. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.) The appellate court will not disturb the juvenile court's balancing of interests unless the order is not supported by substantial evidence (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 425), or the court abused its discretion (*Jasmine D.,* supra, 78 Cal.App.4th at p. 1351; see *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 [substantial evidence standard of review applies to existence of a beneficial parental or sibling relationship; abuse of discretion standard applies to whether existence of relationship constitutes a compelling reason for determining that termination would be detrimental].)

Mother argues she maintained regular and consistent visitation with Timothy and her continuous unmonitored contact with Timothy "necessarily resulted in a strong bond. Timothy certainly knew his mother and was observed laughing and smiling at his most recent visit [on September 12]. His behavior during the visits with mother was void of the aggressive behaviors he displayed in foster care and against the foster family members." Mother also states she "consistently visited Timothy, [] she always had food, toys, and books for him at the visits, loved him deeply, and went above and beyond to have a chance at reunification. Timothy knew his mother and enjoyed many

19

hours of unmonitored visitation with her during the pendency of the case." She asserts Timothy's behavior in resisting visits with her "was not descriptive of the visitation during the pendency of the case that started in April 2012 and ended in September 2013" and "did not represent his desire to see his mother." Mother also states during the period Timothy resisted visits (March to May 2013), Timothy was also "experiencing difficulty communicating and was very aggressive towards his previous foster family and peers at school while in that home." She notes the record contains no description of visits after June 2013 (other than September 6 and 12) and on September 12 Timothy was observed happy and smiling.

Substantial evidence supports the court's finding Timothy's relationship with mother did not promote his well-being to the extent it outweighed the benefits he would gain in a permanent home with adoptive parents. Timothy, four years old at the time of section 366.26 hearing, had lived in foster homes for more 75 percent of his life. The record, recounted above, disclosed the lack of emotional interaction between Timothy and his mother. Not all aspects of Timothy's visits with his mother were unpleasant, but evidence of congenial visits fall short of the compelling reasons necessary to outweigh the stronger preference for adoption. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.) The record does not reflect Timothy's relationship with mother was so "emotionally significant" that losing that relationship would be detrimental enough to preclude placement in a permanent home. (*In re S.B.* (2008) 164 Cal.App.4th 289, 298 [child loved the father, wanted their relationship to continue, derived some measure of benefit from his visits, and a psychologist testified that due to a "'fairly strong'" bond there was a potential for harm to the child in losing the parent-child relationship].)

## III

### DISPOSITION

The judgment terminating parental rights is affirmed.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.